UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

United States of America,

> Plaintiff,

REPORT AND RECOMMENDATION

vs.

Matthew X. Lindgren,

> Defendant.          Crim. No. 08-36 (JMR/RLE)

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## I. Introduction

This matter came before the undersigned United States Magistrate Judge pursuant to a general assignment, made in accordance with the provisions of Title 28 U.S.C. §636(b)(1)(B), upon the following Pretrial Motions of the Defendant Matthew X. Lindgren:

> 1.     The Defendant's Motion to Suppress Evidence Obtained as a Result of Search and Seizure.
>
> 2.     The Defendant's Motion to Suppress Statements, Admissions, and Answers.

A Hearing on the Motions was conducted on April 7, 2008, at which time, the Defendant appeared personally, and by Lyonel Norris, Assistant Federal Defender;

and the Government appeared by Christopher R. Wolfe, Assistant United States Attorney.[1]  For reasons which follow, we recommend that the Motions be denied.

## II.  Factual Background

The Defendant is charged with one Count of Manufacturing and Possessing Marijuana, with intent to distribute, in violation of Title 21 U.S.C. §§841(a)(1), and 841(b)(1)(B).  The alleged violation is said to have occurred on or about September 11, 2007, in this State and District.  As pertinent to those charges, and to the Motions now before us, the operative facts may be briefly summarized.[2]

---

[1]At the close of the Hearing, the parties requested leave to submit post-Hearing memoranda on the legal issues raised by the Defendant's Motions.  Leave was granted, however, the Defendant ultimately filed no post-Hearing submission.  The deadline for his submission having passed on April 21, 2008, we took the Motions under advisement on that date, see, Title 18 U.S.C. §3161(h) (1)(F) and (J); Henderson v. United States, 476 U.S. 321, 330-32 (1986); United States v. Blankenship, 67 F.3d 673, 767-77 (8th Cir. 1995), after the Government advised that it would also forego any post-Hearing briefing.

[2]Rule 12(e), Federal Rules of Criminal Procedure, provides that "[w]here factual issues are involved in determining a motion, the court shall state its essential findings on the record."  As augmented by our recitation of factual findings in our "Discussion," the essential factual findings, that are required by the Recommendations we make, are contained in this segment of our Opinion.  Of course, these factual findings are preliminary in nature, are confined solely to the Motions before the Court, and are subject to such future modification as the subsequent development of the facts and law may require.  See, United States v. Moore, 936 F.2d 287, 288-89 (6th Cir. 1991), cert. denied, 505 U.S. 1228 (1992); United States v. Prieto-Villa, 910 F.2d 601, 610 (9th Cir. 1990).

At the Motions Hearing, the Government adduced the testimony of Keith P. McAuliffe ("McAuliffe"), who is a Special Agent with the United States Forest Service ("USFS"), and who was involved in the investigation, traffic stop, and interview, that gave rise to the pending charge. McAuliffe testified that, in late June of 2007, a USFS contractor discovered a marijuana garden, in a remote area of the Chippewa National Forest, and reported his discovery to the USFS. Accordingly, McAuliffe, and investigators from Itasca County, located the garden, in a boggy area, approximately 250 yards from a dead-end, unimproved dirt road belonging to the USFS. McAuliffe, and the Itasca County investigators, also verified that the garden consisted of approximately seven (7) plots, with thirty (30) to forty (40) marijuana plants in each plot.

In July of 2007, the USFS set up video cameras, equipped with motion sensors, both near the dirt road, and in the garden, in order to perform surveillance on the site. McAuliffe testified that USFS agents physically visited the site approximately every two (2) weeks, in order to perform maintenance on the video cameras, and to check for any footage. He testified that, on August 3, 2007, video footage was captured of a gold or tan station wagon, with a white male driver and no passengers, traveling on the dead-end dirt road toward the garden. Although the footage showed that the

vehicle bore a Minnesota license plate, McAuliffe testified that the plate number was not visible.  McAuliffe also testified that law enforcement was unable to positively identify the driver, from that footage.

On August 31, 2007, at approximately 2:50 o'clock a.m., video footage was captured of an individual in the garden.  McAuliffe testified that the footage clearly showed an adult, white man, who resembled the Defendant, with a full head of hair, a mustache, and large forearms, wearing glasses and carrying a flashlight.  McAuliffe further testified that the man appeared to be tending to the marijuana plants, and weeding the garden.  At that time, however, the USFS did not positively identify the man as the Defendant.

According to McAuliffe, on September 9, 2007, at approximately 4:30 o'clock p.m., Robert LeClair ("LeClair"), who is a Deputy with the Itasca County Sheriff's Department, was on County Road 49, approximately four (4) miles from the marijuana garden, when he saw a gold station wagon.  The vehicle was traveling westbound, toward the marijuana garden.  Approximately thirty (30) minutes later, the vehicle returned, traveling eastbound on the County Road 49, and LeClair decided to follow it, in order to obtain its license plate number.  LeClair noted that the vehicle had a white male driver, and that it bore Minnesota license plate number LXL 612.

Further investigation disclosed that the vehicle was registered to the Defendant, at his grandmother's residence in Kelly Lake, Minnesota.  LeClair did not conduct a traffic stop on September 9, 2007.  Instead, he reported his findings to the USFS on September 10, 2007.

Thereafter, McAuliffe asked LeClair, and another USFS officer, to visit the marijuana garden on September 10, 2007.  The officers discovered that almost all of the marijuana leaves, and related buds, had been harvested, leaving only the plants' stalks, and a few scattered leaves in place.  In addition, McAuliffe testified that video footage, which was recorded on September 9, 2007, showed a gold or tan station wagon, with a white male driver, traveling on the dirt road, and proceeding away from the marijuana garden, shortly after LeClair had first spotted the Defendant's wagon in the vicinity.[3]

---

[3]McAuliffe further testified that, between July of 2007, when the USFS began its video surveillance, and September of 2007, the video cameras captured only a few other vehicles on the dirt road, and that no vehicle, other than the gold or tan station wagon, was seen on more than one (1) occasion.  McAuliffe testified that, on one occasion, two (2) all-terrain vehicles were captured on video footage.  On another occasion, a Chevrolet pick-up truck, which was carrying an all-terrain vehicle, was depicted on the dirt road.  Lastly, on one occasion, during which the video cameras were turned off for maintenance, McAuliffe, himself, observed a pick-up truck, bearing an Illinois license plate, on the dirt road, and he took a photograph of that vehicle.

McAuliffe became concerned that the evidence would be lost if were not promptly located, and so he asked nearby law enforcement agencies to keep a look-out for the Defendant, and his gold station wagon.[4]  The next day, on September 11, 2007, McAuliffe received a call from an officer in St. Louis County, who advised that he was following the Defendant's gold station wagon near the border of Itasca County. On cross-examination, McAuliffe testified that the St. Louis County officer reported only that the Defendant was driving "very slowly," but he did not report any violation of the traffic laws.  At that point, McAuliffe, and three other officers, decided to take over surveillance of the Defendant's vehicle, as it traveled into Itasca County. McAuliffe was in an unmarked USFS vehicle, accompanied by Officer Letterman ("Letterman") of the USFS, LeClair was in his own marked vehicle, and Dean A. Scherf Jr. ("Scherf"), who is a Deputy with the Itasca County Sheriff's Department, was in a third vehicle, which was unmarked.

At the Hearing, the Government also adduced the testimony of Scherf, who testified that he was aware of the investigation of the marijuana garden, which had been ongoing through the summer of 2007, and that he had visited the garden on June

---

[4]In addition to Itasca County, McAuliffe asked officers in St. Louis County to watch for the Defendant's vehicle, given that the Defendant resided in an apartment in Hibbing, Minnesota.

25, 2007, when it was originally reported to law enforcement. Accordingly, he knew of the Defendant's connection to his grandmother's residence, in Kelly Lake, for several months prior to September 11, 2007, when Scherf, McAuliffe, Letterman, and LeClair, conducted surveillance of the Defendant in his vehicle, near Keewatin, Minnesota, at the border of Itasca County, and St. Louis County.

Scherf testified that he decided to conduct a traffic stop of the Defendant, once the Defendant turned north on Kelly Lake Road, in order to prevent him from reaching his grandmother's residence. Scherf stated that he was concerned about preserving any evidence, including the harvested marijuana, in part because a prosecution, under Minnesota law, would require leaves and buds, rather than just the stalks which had been left in the marijuana garden. Scherf stated that he used the flashing lights and siren of his unmarked vehicle in order to effect the traffic stop. On cross-examination, Scherf acknowledged that the Defendant was not violating any traffic laws at the time of the traffic stop.

After approaching the Defendant's vehicle, Scherf identified himself, showed his badge, and advised the Defendant that he wished to speak with him about an investigation. Scherf testified that he made no mention, at that time, of the marijuana garden. The Defendant agreed to speak with Scherf. Scherf further attested that he

smelled a strong odor of marijuana, when the Defendant rolled down the window to speak with him, and Scherf also saw part of a green leaf, in plain view, in the backseat of the vehicle.  According to Scherf, the Defendant did not appear to be under the influence of alcohol, or other drugs, at the time of the traffic stop.  After the Defendant consented to speak with Scherf, Scherf informed the Defendant that he could smell marijuana, and asked if he would also consent to a vehicle search.

As recounted by Scherf, the Defendant gave his consent, and LeClair and Letterman searched the vehicle, and recovering only the leaf fragment, a possible marijuana seed, and a pair of muddy boots.[5]  Scherf testified that the traffic stop lasted approximately five (5) to ten (10) minutes.

At that point, Scherf asked the Defendant if he would be willing to travel to the Keewatin police station, which was approximately five (5) or (6) miles away, in order to talk about the investigation.  Scherf testified that he normally conducts interviews while indoors, rather than on a roadside, in part for protection from the elements, and in part for officer safety.  The Defendant agreed to be interviewed at the Keewatin

---

[5]McAuliffe testified that neither the leaf fragment, nor the possible seed, were ever tested for the presence of marijuana.

police station, and Scherf stated that he made no threats or promises in order to obtain the Defendant's consent.

Scherf then asked the Defendant if he would be willing to ride in Scherf's vehicle, while another officer followed in the Defendant's vehicle, and again, the Defendant agreed.  On cross-examination, Scherf testified that he did not want the Defendant to drive his own vehicle, in case it contained marijuana.  Accordingly, the Defendant rode to the Keewatin police station in the front passenger seat of Scherf's vehicle, while McAuliffe, LeClair, and Letterman followed.[6]

During the trip to the police station, which lasted approximately five (5) minutes, Scherf again advised the Defendant that he wanted to speak to him about an ongoing investigation, and he asked the Defendant to be honest in his responses. Scherf further advised the Defendant that, no matter what transpired during their interview, the Defendant would not be arrested that day.  Scherf advised the Defendant that he was not under arrest, and that he was free to leave.  On cross-examination, Scherf stated that, if, during the course of the trip to the police station,

---

[6]Although it is not clear, on this Record, who drove the Defendant's car to the Keewatin police station, it is clear, from the testimony of both McAuliffe and Scherf, that either McAuliffe, Letterman, or LeClair did so, since Scherf drove his own vehicle, with the Defendant as his passenger, and because the Defendant's car was driven to the station.

the Defendant had changed his mind about participating in the interview, then Scherf would have pulled over, and the Defendant's vehicle would have been returned to him. Similarly, McAuliffe testified that, if the Defendant had asked to leave, at any point on September 11, 2007, then he would not have been arrested, and he would have been free to leave.

Once the caravan arrived at the police station, all four (4) vehicles were parked, and McAuliffe and Scherf conducted an interview of the Defendant, while Letterman and LeClair waited in the station lobby. The interview was conducted in an open office area, which contained several desks, and it lasted approximately 45 to 60 minutes. Both Scherf and McAuliffe were dressed in plainclothes. The interview was audiotaped by Scherf and, at the Hearing, the Government submitted, without objection, an audio recording of the interview. See, Exhibit 1A. In addition, the Government introduced a transcript of the interview, see, Exhibit 1, which we provisionally admitted, in order to provide the Defendant, and his counsel, an opportunity to review it for accuracy. Both McAuliffe, and Scherf, attested to the transcript's accuracy.[7]

---

[7]To date, the Defendant has not voiced any objection to the accuracy of that transcript.

Both McAuliffe and Scherf testified that Scherf took the lead on the interview, by asking most of the questions.  After starting the audiotape, Scherf advised the Defendant that he was not under arrest, nor had he been charged with any crime, and the Defendant confirmed his understanding of those representations.  During their testimony, Scherf and McAuliffe both recalled that the Defendant initially denied any involvement in the marijuana garden.  However, after Scherf informed the Defendant that they had conducted video surveillance at the garden, the Defendant eventually confessed to planting the garden, and he admitted that he had harvested the marijuana on September 9, 2007.

Following the Defendant's confession, Scherf asked the Defendant where he had stored the marijuana, following its harvest.  Again, Scherf and McAuliffe testified that the Defendant was initially reluctant to confess where the marijuana was hidden. Scherf then asked the Defendant if he had hidden the marijuana at his grandmother's residence, in Kelly Lake, and the Defendant admitted that he had.  Both McAuliffe and Scherf testified that the Defendant did not want his grandmother to learn that he had hidden the marijuana at her house, but the Defendant agreed to let McAuliffe and Scherf retrieve the marijuana.  McAuliffe testified that, after the Defendant had confessed to growing and harvesting the marijuana, Scherf mentioned the possibility

of obtaining a Search Warrant, for the grandmother's residence, and thereafter, the Defendant admitted that he had stored the marijuana at his grandmother's residence. Both McAuliffe and Scherf testified that, if the Defendant had not led them to the marijuana, or if he had not admitted to its location, then they would have sought a Search Warrant for the Defendant's known residences, including his grandmother's residence, in Kelly Lake.

At that point, the officers, and the Defendant, left the Keewatin police station, in order to travel to Kelly Lake. The Defendant drove himself, in his vehicle, and the officers traveled in a separate vehicle. The vehicles stopped at the parking lot of a boat landing, near the grandmother's residence and, at that point, McAuliffe got in the front passenger seat of the Defendant's vehicle. From there, only the Defendant and McAuliffe traveled to the grandmother's residence, and McAuliffe -- again, dressed in plainclothes -- posed as a friend of the Defendant. The Defendant led McAuliffe to a pick-up camper, which was parked on his grandmother's property, and McAuliffe recovered the remnants of approximately 200 green marijuana plants, which had been laid out to dry in the camper. From there, the Defendant drove McAuliffe, and the marijuana, back to the boat landing parking lot. At that point, the Defendant left the parking lot in his own vehicle, while the officers left in their vehicles. McAuliffe

testified that the plants' leaves, stems, and buds, had been tested, but not weighed, and that they remained in the possession of law enforcement, at the time of the Hearing.

Lastly, McAuliffe and Scherf testified that the Defendant was never handcuffed, nor placed under arrest, at any time on September 11, 2007, throughout the course of the traffic stop, the interview, and during the visit to his grandmother's residence.

## III.  Discussion

With respect to his Motion to Suppress Statements, Admissions and Answers, we understand the Defendant to argue that he was in custody, as a result of the traffic stop, as well as during the subsequent interview, and therefore, he should have received a Miranda advisory, see, Miranda v. Arizona, 384 U.S. 436, 444 (1966), and he further argues that he did not voluntarily consent to participate in the interview. Accordingly, the Defendant's Motion to Suppress Evidence -- namely, the marijuana which was seized at his grandmother's residence -- flows from his challenge to the traffic stop, and his subsequent interview.   As a result, the threshold issue involves the validity of the initial traffic stop, and of the Defendant's consent to be interviewed. If we conclude that the traffic stop was permissible, that the Defendant consented to be interviewed, and that he was not subject to custody, then both of his suppression Motions should be denied.

A.   The Validity of the Traffic Stop.

1.   Standard of Review.  The Fourth Amendment provides that "the right of people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated."  United States Constitution, Amendment IV.  A roadside traffic stop "is well established" as a "'seizure' within the meaning of the Fourth Amendment."  United States v. Jones, 269 F.3d 919, 924 (8th Cir. 2001); quoting Delaware v. Prouse, 440 U.S. 648, 653 (1979); see also United States v. Martinez-Fuerte, 428 U.S. 543, 556-558 (1976); United States v. Brignoni-Ponce, 422 U.S. 873, 878 (1975).   An essential purpose behind the Fourth Amendment's proscriptions is to impose standards of reasonableness upon the exercise of law enforcement's discretionary powers, so as to safeguard an individual's privacy from arbitrary invasion by the Government.  See, Delaware v. Prouse, supra at 653-54; Marshall v. Barlow's Inc., 436 U.S. 307, 312 (1978); Camara v. Municipal Court, 387 U.S. 523, 528 (1967).  Thus, whether or not a certain action is permissible, under the Fourth Amendment, "is judged by balancing [that action's] intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests."  Id. at 654.

- 14 -

In considering the extent to which a traffic stop intrudes upon an individual's Fourth Amendment interests, the Supreme Court has held that traffic stops are investigative detentions, not custodial detentions, and therefore, the principles of Terry v. Ohio, 392 U.S. 1 (1968), govern the analysis of the reasonableness of the stop.  See, United States v. Jones, supra at 925, citing Berkemer v. McCarty, 468 U.S. 420, 439 (1984); see also, Delaware v. Prouse, supra at 663.  "Generally, a traffic 'stop must be supported by at least a reasonable, articulable suspicion that criminal activity' has occurred or is occurring."  United States v. Blaylock, 421 F.3d 758, 767 (8th Cir. 2005), cert. denied, 546 U.S. 1126 (2006), quoting United States v. Jones, supra at 924.  "A traffic violation, no matter how minor, creates probable cause for a law enforcement officer to stop the vehicle."  Id., citing United States v. Barry, 98 F.3d 373, 376 (8th Cir. 1996).

However, there is no requirement that there be a traffic violation, so long as the police officer has a reasonable suspicion that the vehicle, or its occupants, are involved in criminal activity.  See, United States v. Mora-Higuera, 269 F.3d 905, 909 (8th Cir. 2001), citing Alabama v. White, 496 U.S. 325 (1990).  "Reasonable suspicion requires "'a particularized and objective basis" for suspecting the person stopped of criminal activity,'" which is not as demanding a standard as a showing of probable

cause. Thomas v. Dickel, 213 F.3d 1023, 1025 (8th Cir. 2000), quoting Ornelas v. United States, 517 U.S. 690 (1996), quoting in turn, United States v. Cortez, 449 U.S. 411, 417 (1981); and citing, United States v. Sokolow, 490 U.S. 1 (1989). Notably, "[a] reasonable suspicion may be justified even if there are innocent explanations for a defendant's behavior when the circumstances are considered in the totality." United States v. Tuley, 161 F.3d 513, 515 (8th Cir. 1998), citing United States v. Bloomfield, 40 F.3d 910, 918 (8th Cir. 1994)[en banc], cert. denied, 514 U.S. 1113 (1995).

If an investigatory stop is not justified by reasonable suspicion, any evidence derived from the stop is inadmissible at Trial. See, United States v. Wheat, 278 F.3d 722, 726 (8th Cir. 2001), citing Wong Sun v. United States, 371 U.S. 471, 484 (1963). "A passenger in a motor vehicle has standing to challenge the stop of that vehicle." Id., citing United States v. Lyton, 161 F.3d 1168, 1170 (8th Cir. 1998).

      2.    Legal Analysis. At the outset, we find that Scherf had a reasonable articulable suspicion for effecting the stop of the Defendant's vehicle. At the time that he made the stop, Scherf suspected that the Defendant was involved in the marijuana garden, which had been discovered in the Chippewa National Forest. Scherf based that suspicion on the investigation, which had taken place over the course of the summer, and which had resulted in video footage of a vehicle, that was similar to the

- 16 -

Defendant's, and a man who resembled the Defendant, at the marijuana garden, as well as LeClair's surveillance of the Defendant's vehicle, in the vicinity of the marijuana garden, on the same date that law enforcement suspected that the marijuana had been harvested.  Accordingly, we find no Fourth Amendment violation in the traffic stop of the Defendant's vehicle.[8]

---

[8]Since Scherf testified that nothing of evidentiary value was found during the search of the Defendant's vehicle, we conclude that the Defendant does not seek to suppress any evidence, which was uncovered during that search.  However, were we to reach the question, we would observe, first, that Scherf was permitted to conduct a "reasonable investigation," once he had effected the traffic stop.  See, United States v. Johnson, 58 F.3d 356, 357 (8th Cir. 1995); see also, United States v. Foley, 206 F.3d 802, 805 (8th Cir. 2000); see also, United States v. Sanchez, 417 F.3d 971, 974-75 (8th Cir. 2005).

Once he smelled marijuana coming from the Defendant's vehicle, Scherf was permitted to ask questions about that smell, and to ask for the Defendant's consent to search the vehicle.  See, United States v. Tillmon, 64 F.3d 1120, 1124 (8th Cir. 1995), citing United States v. Cummins, 920 F.2d 498, 501 (8th Cir. 1990); United States v. Foley, supra at 806 ("An officer may properly expand the scope of his investigation as reasonable suspicion dictates."); United States v. Allegree, 175 F.3d 648, 650 (8th Cir. 1999)("[C]onsent given in the course of such questioning is valid so long as it is voluntary."), citing United States v. Pereira-Munoz, 59 F.3d 788, 791 (8th Cir. 1995). We find nothing, in this Record, to suggest that the Defendant's consent to search his vehicle was less than voluntary, for the same reason that we conclude, in the text of this opinion, that the Defendant voluntarily consented to participate in his interview. See, United States v. Pennington, 287 F.3d 739, 746 (8th Cir. 2002)("'An officer with consent needs neither a warrant nor probable cause to conduct a constitutional search.'"), cert. denied 537 U.S. 1022 (2002), quoting United States v. Jenkins, 92 F.3d 430, 436 (6th Cir. 1996), citing in turn Schneckloth v. Bustamonte, 412 U.S. 218,

(continued...)

B.    The Interview.

1.    Standard of Review.  Government agents are not required to administer Miranda warnings to everyone whom they question.  See, Oregon v. Mathiason, 429 U.S. 492, 495 (1977).  Rather, Miranda warnings are required for official interrogations where a person has been "'taken into custody or otherwise deprived of his freedom of action in any significant way.'"  Stansbury v. California, 511 U.S. 318, 322 (1994), quoting Miranda v. Arizona, supra at 444; United States v. Helmel, 769 F.2d 1306, 1320 (8th Cir. 1985); Berkemer v. McCarty, supra at 428-29.

Whether an accused was subjected to custodial interrogation is to be determined from the totality of the circumstances.  See, United States v. Hanson, 237 F.3d 961, 963 (8th Cir. 2001); California v. Beheler, 463 U.S. 1121, 1125 (1983).  In determining whether a suspect is "in custody," we examine whether the extent of the physical or psychological restraints, which were imposed upon the Defendant, during an interrogation by law enforcement, would have been understood by a "reasonable person in the [Defendant's] position" as being consonant with the condition of being in custody.  Berkemer v. McCarty, supra at 442; United States v. Cates, 251 F.3d

---

[8](...continued)
218 (1973).

1164, 1166 (8th Cir. 2001); United States v. Carter, 884 F.2d 368, 370 (8th Cir. 1989).

As the Court in United States v. Griffin, 922 F.2d 1343, 1357 (8th Cir. 1990), stated:

"If [the Defendant] believed his freedom of action had been curtailed to a 'degree

associated with formal arrest,' and that belief was reasonable from an objective

viewpoint, then [the Defendant] was being held in custody during the interrogation."

See also, Stansbury v. California, supra at 1529; United States v. Chamberlain, 163

F.3d 499, 503 (8th Cir. 1998).

Under the law of this Circuit, the relevant factors, which are to be considered

in making a determination of custody, include an accused's freedom to leave the

scene, and the purpose, place, and length, of the interrogation.  See United States v.

Griffin, supra at 1349.  The most comprehensive list of factors -- although admittedly

not exhaustive -- was enumerated, as follows, in United States v. Griffin, supra at

1349:

> [The] inquiry into the indicia of custody has generally
> focused on an examination of (1) whether the suspect was
> informed at the time of questioning that the questioning
> was voluntary, that the suspect was free to leave or request
> the officers to do so, or that the suspect was not considered
> under arrest; (2) whether the suspect possessed unrestrained
> freedom of movement during questioning; (3) whether the
> suspect initiated contact with authorities or voluntarily
> acquiesced to official requests to respond to questions; (4)
> whether strong arm tactics or deceptive stratagems were

> employed during questioning; (5) whether the atmosphere
> of the questioning was police dominated; or, (6) whether
> the suspect was placed under arrest at the termination of the
> questioning.

The Court has regarded the first three of the Griffin factors as mitigative in their effect upon the ultimate determination, for the presence, during questioning, of one or more of those factors would tend to weigh against a finding of custody.  On the other hand, the remaining three factors have been characterized as coercive in their effect, since those factors would tend to accentuate the existence of custody.  A "finding of custody does not, however, have to be supported by all six factors."  United States v. Galceran, 301 F.3d 927, 930 (8th Cir. 2002), citing United States v. Griffin, supra at 1349; see also, United States v. McKinney, 88 F.3d 551, 554 (8th Cir. 1996).

Whether or not Miranda is implicated, the Supreme Court has recognized that, in order for a confession to be admitted into evidence, it must be voluntary if it is to satisfy the Fifth Amendment's right against self-incrimination.  See, Dickerson v. United States, 530 U.S. 428, 433-34 (2000).  For a confession to be considered voluntary, a Court must examine "'whether a defendant's will was overborne' by the circumstances surrounding the giving of a confession."  Dickerson v. United States, supra at 434, citing Schneckloth v. Bustamonte, 412 U.S. 218, 226 (1973).

As the Supreme Court has recently explained:

- 20 -

>The due process test takes into consideration "the totality of all the surrounding circumstances -- both the characteristics of the accused and the details of the interrogation." [Schneckloth v. Bustamonte, 412 U.S. at 226.] See also Haynes [v. Washington, 373 U.S. 503, 513] (1963); Gallegos v. Colorado, [370 U.S. 49, 55] (1962); Reck v. Pate, [367 U.S. 433, 440] (1961) ("[A]ll the circumstances attendant upon the confession must be taken into account"); Malinski v. New York, [324 U.S. 401, 404] (1945) ("If all the attendant circumstances indicate that the confession was coerced or compelled, it may not be used to convict a defendant").   The determination "depend[s] upon a weighing of the circumstances of pressure against the power of resistance of the person confessing." Stein v. New York, [346 U.S. 156, 185] (1953).

Id. at 434.

Among the circumstances, which are to be considered in this analysis are, first and foremost, whether a Miranda warning has been given, see, Withrow v. Williams, 507 U.S. 680, 693 (1993); any elements of "police coercion," see, Colorado v. Connelly, 479 U.S. 157, 167 (1986); the length of the interrogation, see, Ashcraft v. Tennessee, 322 U.S. 143, 153-154 (1944); the location of the interrogation, see, Reck v. Pate, 367 U.S. 433, 441 (1961); and the continuous nature of the interrogation, see, Leyra v. Denno, 347 U.S. 556, 561 (1954).  See also, Withrow v. Williams, supra at 693 (listing the applicable considerations).

- 21 -

2.      Legal Analysis.  The Defendant contends that he was effectively in custody, during the course of his traffic stop and the subsequent interview, and that, as a result, his statements were involuntary.  We disagree.

At the outset, we note that, during the course of the traffic stop, which lasted five to ten minutes, the Defendant was the subject of a Terry stop.  "Miranda warnings are not necessary during ordinary Terry stops because they generally do not amount to custodial interrogation."  United States v. Johnson, 64 F.3d 1120, 1126 (8th Cir. 1995), cert. denied, 516 U.S. 1139 (1996), citing Berkemer v. McCarty, supra at 439-40; see also, United States v. McGauley, 786 F.2d 888, 890 (8th Cir. 1986)("No Miranda warning is necessary for persons detained for a Terry stop."); United States v. Pelayo-Ruelas, 345 F.3d 589, 592 (8th Cir. 2003).  Moreover, the Defendant was not subjected to any questioning during the course of the traffic stop.

With respect to the Defendant's argument, that he was effectively placed in custody when Scherf asked him to ride as a passenger, in Scherf's vehicle, to the police station, we are guided by our Court of Appeals' analysis in United States v. LeBrun, 363 F.3d 715, 718 (8th Cir. 2004), cert. denied, 543 U.S. 1145 (2005), where two (2) law enforcement officers approached the defendant at his place of employment, told him that they were conducting an investigation, and asked him to

come to the police station for an interview.  Although the officers did not advise the

defendant of the nature of the investigation, the defendant agreed to the interview and,

pursuant to the officers' suggestion, rode to the station house in the front seat of an

unmarked patrol car.  Upon their arrival at the station, one of the officers advised the

defendant that he was not under arrest, that he was free to terminate the impending

interview at any time, and that he was free to leave at any time.  The officers then took

the defendant to a windowless interview room, which had enlarged photographs of

scenes from the defendant's life on its walls.  During the interview, the officers used

a number of psychological ploys, which were designed to secure a confession, such

as telling him that he was the prime suspect in a murder investigation, that the officers

had significant evidence showing him to be the perpetrator of the murder, and that a

trial of the matter would cause him financial hardship, and ruin his family's

reputation.  The defendant, who had not been advised of his Miranda rights,

subsequently confessed to the murder.  Following a telephone call to his wife, the

officers brought the defendant to his house.  The defendant was not arrested at that

time.

Applying the totality of the circumstances, the Court found that the defendant

was not "in custody" during the interview.  In so finding, the Court 'discounted' the

fact that the interview took place in a station house, "in a small windowless room; that the authorities admittedly used deceptive interview tactics; that the interview was designed to produce incriminating responses as evidenced by the large photographs on the wall; and that the agents falsely trumped up the evidence that they said they possessed," id. at 721, reasoning as follows:

> [Oregon v.] Mathiason and [California v.] Beheler teach us that some degree of coercion is part and parcel of the interrogation process and that the coercive aspects of a police interview are largely irrelevant to the custody determination except where a reasonable person would perceive the coercion as restricting his or her freedom to depart.
>
> *     *     *
>
> Whatever coercion existed in this case was not of the sort that a reasonable person would perceive as restricting his freedom to depart.  Indeed, the facts support the opposite conclusion.   [The defendant] was never physically restrained. He was never placed in handcuffs.  The agents told [the defendant] before the interview commenced that he was free to leave.  [The defendant] testified that he understood that he was free to terminate the interview and leave at any time.  [The defendant] had his cellular phone with him during the interview, and he called his wife from the interview room.

Id. at 721-22.

Similarly, in United States v. Black Bear, 422 F.3d 658 (8th Cir. 2005), the Court

applied the Griffin factors, and found that the defendant was not in custody, under the

following circumstances:

>    1.    [The defendant] was informed at the time of his
>    interview that he was not under arrest, would not be
>    arrested at the end of the interview, did not have to speak
>    with [the interviewing officer], and could end the interview
>    at any time;
>
>    2.    While [the defendant] did not have unrestrained
>    freedom of movement during the interview because it
>    occurred in a closed-door room in the police department, he
>    nonetheless accompanied [the interviewing officer] to the
>    room and was not handcuffed or restrained at any time
>    during the interview;
>
>    3.    [The defendant] voluntarily acquiesced to [the
>    interviewing officer's] requests to respond to questions;
>
>    4.    No strong-arm tactics or deceptive strategies were
>    employed during his interview;
>
>    5.    While the atmosphere was police-dominated to some
>    extent, it was not overly so to the point that [the
>    defendant's] freedom of movement was restrained to the
>    degree associated with formal arrest; and
>
>    6.    He was not placed under arrest at the termination of
>    the interview.

Id. at 662-63, citing United States v. Axsom, 289 F.3d 496, 500 (8th Cir. 2002).

Given the circumstances which surrounded the questioning in LeBrun, and Black Bear, we are persuaded that the Defendant was not in custody at any time during the events of September 11, 2007.

In so finding, we note that the balance of the Griffin factors weighs against custody. Specifically, while four (4) law enforcement officers were present during the traffic stop, the actual interview took place at the police department, and was conducted by only two (2) officers. See, United States v. Axsom, supra at 502 (interview was not custodial despite the presence of nine Agents, where only two Agents participated in the interview, the evidence reflected a "more casual scene," and the interview was conducted in the defendant's home). In addition, the fact that an interview was conducted at a police station does not transform the interview into a custodial situation. See, United States v. LeBrun, supra at 722; United States v. Galceran, supra at 931("[T]he interview's setting was not police dominated, even though the interview took place at a police station."). Also, here, at the outset of the interview, the Defendant was advised that he was not under arrest, and that he was free to end the interview at any time. Scherf also testified that, during the drive to the police station, he advised the Defendant that he would not be placed under arrest on that day. Moreover, during the course of the traffic stop, the Defendant was never

- 26 -

informed that he was required to submit to questioning at the police station, although Scherf did advise that, if the Defendant were willing to cooperate, Scherf wished to conduct the interview at the police station.

The absence of the usual attributes of custody also weighs against the Defendant's characterization that he was subjected to custodial questioning. While the Defendant was transported in an unmarked police vehicle, he consented to having another officer drive his car, **after** he had already consented to a vehicle search. The Defendant was never placed in handcuffs, nor was he otherwise restricted in his freedom of movement, in any way, and he rode in the front seat of Scherf's vehicle.

We specifically find that, at no time, did McAuliffe or Scherf threaten, or deliberately deceive the Defendant, nor did they engage in questioning that was designed to intimidate him, or overbear his will. It is also abundantly clear, on this Record, that the Defendant voluntarily agreed to travel to the police station, and to answer the officers' inquiries. Moreover, upon the Defendant's arrival at the police station, Scherf asked him if he willingly came to the Keewatin police station to answer questions, and the Defendant responded affirmatively. See, <u>Government Exhibit 1</u>, at 4.

We further find that the atmosphere of the interview, as well as his transport to the police station, were not so dominated by the police as to render the Defendant "in custody."  While a total of four (4) officers were present at the traffic stop, the testimony of Scherf establishes that the Defendant was not coerced, or deceived, into traveling to the police station, for his decision was voluntary.  Similarly, there is no showing that the Defendant was compelled to go to the police station.  According to Scherf's testimony, he told the Defendant that he wished to speak with him about an ongoing investigation, and the Defendant agreed to talk, and was willing to travel to the police station.  The fact that the Defendant was transported to the interview in an unmarked police vehicle, with a police officer in the vehicle, does not weigh, by itself, in favor of a finding of custody.  See, United States v. LeBrun, supra at 718, 723 (finding no custody for Miranda purposes, when defendant rode in front of unmarked patrol car to an interview at a police station).  Moreover, there has been no suggestion that any of the law enforcement officers engaged in any show of authority, such as could responsibly leave an impression that the Defendant was not free to decline an interview.

In addition, the interview did not take place in an interrogation room, but rather, in an open office area.  We are mindful that the interviewing officers may have been

armed, but there is no suggestion that any weapons were brandished, or were otherwise the focal point of any commentary or objection. Accordingly, we find that the atmosphere of the questioning does not significantly weigh in favor of custody. Furthermore, the Defendant was not taken into custody following the interview, as he left the police station on his own volition, and in his own vehicle. See, United States v. Galceran, supra at 931 (describing the lack of an arrest as "a very important factor weighing against custody.").

In sum, we find and conclude, on this Record, that the Defendant could not have reasonably concluded that he was under formal arrest at the time of his interview on September 11, 2007, and therefore, based upon an objective analysis of the Griffin factors, the Defendant was not in custody during the course of the interview.

Moreover, based mainly upon the same factors, as particularly focused by the Defendant's age, we also find that the statements made by the Defendant, during the interview, were voluntarily given. Specifically, the Record reflects that the Defendant was advised that he was free to leave at any time, the Defendant was not handcuffed, or otherwise had his freedom of movement restricted, and there has been no showing that the officers engaged in any coercive conduct during the course of the interview. We have no reason to believe, and the Record suggests none, that, had the Defendant

requested the interview to stop, or had he refused to participate, that he would have suffered any adverse consequences from that choice.

Accordingly, we find that the interviewing officers did not engage in any coercive conduct, much less conduct sufficient to have overborne the Defendant's will, given the length of the interview.  See, e.g., United States v. Goudreau, 854 F.2d 1097, 1098 (8th Cir. 1988)(two and one-half hour interview was not "excessively lengthy."); Jenner v. Smith, 982 F.2d 329, 334 (8th Cir. 1993)(interviews which extended for six or seven hours, without a full Miranda advisory, did not prompt an involuntary confession, citing cases), cert. denied, 510 U.S. 822 (1993).  Notably, the Defendant fails to sustain his assertion, that any of his statements were involuntary, with any specific, and evidence-based, demonstrations of coercion.  As we have detailed, the Defendant's interview was the product of his election to cooperate with law enforcement after his arrest.

The Defendant does not contend that the length of the interrogation was unduly burdensome, that he was denied any of the normal accommodations of daily living, or that the officers duped him into lending his cooperation to their investigation.  He does not suggest, let alone support, the existence of any physical, or mental impairments, which would impact upon the voluntariness analysis.  Accordingly,

since we find that the Defendant's will was not overborne by the conduct of the Agents, we also find that Defendant's statements during the interview were voluntary. See, United States v. Galceran, supra at 931("[C]oercive police activity is a "necessary predicate" to a finding that a confession was not voluntary within the meaning of the Due Process clause."), citing Colorado v. Connelly, supra at 165-167; United States v. Kime, 99 F.3d 870, 880 (8ᵗʰ Cir. 1996), cert. denied, 519 U.S. 1141 (1997)("A confession may not be found involuntary absent some type of coercive activity on the part of law enforcement officials."), citing Russell v. Jones, 886 F.2d 149, 151 (8ᵗʰ Cir. 1989).

Therefore, finding no basis to suppress any of his statements, we recommend that the Defendant's Motion be denied.

C.     The Seizure of the Marijuana.

1.     Standard of Review.  The Fourth Amendment to the United States Constitution "generally prohibits the warrantless entry of a person's home, whether to make an arrest or to search for specific objects." Illinois v. Rodriguez, 497 U.S. 177, 180 (1990), citing Payton v. New York, 445 U.S. 573 (1980); Johnson v. United States, 333 U.S. 10 (1948).  However, "'[a]n officer with consent needs neither a warrant nor probable cause to conduct a constitutional search.'" United States v. Pennington, 287 F.3d 739, 746 (8th Cir. 2002), quoting United States v. Jenkins, 92 F.3d 430, 436 (6th Cir. 1996), citing Schneckloth v. Bustamonte, supra.  "Whether or not the consent was voluntary must be established by examining the totality of the circumstances, including '"both the characteristics of the accused and the details of the interrogation."'" United States v. Bradley, 234 F.3d 363, 366 (8th Cir. 2000), quoting United States v. Chaidez, 906 F.2d 377, 380-81 (8th Cir. 1990), quoting, in turn, Schneckoth v. Bustamonte, supra at 226.  "We consider the following characteristics of the individual to determine whether their [sic] consent was truly voluntary: age, intelligence, intoxication, advice of Miranda rights, and previous arrests." United States v. Reinholz, 245 F.3d 765, 780 (8th Cir. 2001), citing United

States v. Chaidez, supra at 381; see also, United States v. Alcantar, 271 F.3d 731, 737 (8th Cir. 2001).

In addition to the characteristics of the defendant, "[w]e also consider the following characteristics of the environment in which the individual's consent was given, so as to determine whether their [sic] consent was truly voluntary:  length of detention, threats and misrepresentations by police, whether the individual is in custody or under arrest, whether it is a public or private place, and the suspect's contemporaneous objections and representations." United States v. Reinholz, supra at 780; see also, United States v. Mendoza-Cepeda, 250 F.3d 626, 629 (8th Cir. 2001)(listing factors to be considered as to voluntariness of consent to search). Ultimately, "[c]onsent is voluntary if it was "'the product of an essentially free and unconstrained choice by its maker,'" * * * rather than 'the product of duress or coercion, express or implied.'" United States v. Bradley, supra at 366, quoting United States v. Chaidez, supra at 380, quoting, in turn, Schneckloth v. Bustamonte, supra at 225, 227.  "[T]he question of whether a consent to search was in fact 'voluntary' or was the product of duress or coercion, expressed or implied, is a question of fact to be determined from the totality of all circumstances." Schneckloth v. Bustamonte, supra at 227.  The Government has the burden to show, by a preponderance of the evidence,

that a defendant's consent was voluntary.  See, <u>United States v. White</u>, 81 F.3d 775,

780 (8th Cir. 1996).

   2. <u>Legal Analysis</u>.  Here, the transcript of the Defendant's interview

with McAuliffe, and Scherf, reveals that the Defendant expressly consented to turning

over the marijuana to law enforcement, and that he expressly consented to have

McAuliffe pose as his friend, in order to prevent his grandmother from learning that

he had stashed his marijuana at her residence.  See, <u>Government Exhibit 1</u>, at 38-39.

 Moreover, "[t]he precise question is not whether [the accused] consented

subjectively, but whether his conduct would have caused a reasonable person to

believe that he had consented."  <u>United States v. Jones</u>, 254 F.3d 692, 695 (8th Cir.

2001).  "Consent can be inferred from words, gestures, and other conduct."  <u>Id.</u>, citing

<u>United States v. Mendoza-Cepeda</u>, supra at 627.  Here, in addition to his express

consent, the Defendant acted in a manner which, objectively, would have provided a

proper basis upon which law enforcement could reasonably infer that consent to seize

the marijuana had been freely given, based on the Defendant's cooperation with the

officers' plan, to have McAuliffe pose as a friend, in order to recover the marijuana.

The Defendant drove in his own car to Kelly Lake, he allowed McAuliffe to ride as

a passenger in his car, and he permitted McAuliffe to seize the marijuana, at his

grandmother's residence.  From there, the Defendant drove McAuliffe back to the other officers.  Those actions, by the Defendant, were consistent with the provision of consent.

In addition, the Defendant was aware, based upon his interview with the officers, that he could refuse to turn over the marijuana, and that the officers would then seek a search warrant.  Compare, United States v. Saenz, 474 F.3d 1132, 1137 (8th Cir. 2007); United States v. Va Lerie, 424 F.3d 694, 710 (8th Cir. 2005), cert. denied, --- U.S. ----, 126 S.Ct 1966 (2006)("The Supreme 'Court has rejected in specific terms the suggestion that police officers must always inform citizens of their right to refuse when seeking permission to conduct a warrantless consent search.'"), quoting United States v. Drayton, 536 U.S. 194, 206 (2002); United States v. Esquivias, 416 F.3d 696, 701 (8th Cir. 2005) ("While the officers did not inform [the defendant] of his right to refuse consent, a defendant need not be aware, nor must an officer inform him, of his right to refuse consent for his consent to be voluntary."), citing United States v. Becker, 333 F.3d 858, 861 (8th Cir. 2003); United States v. Alcantar, supra at 737 ("Although [the defendant] was not advised of his right to refuse consent, that was not in and of itself sufficient to find that consent was not voluntarily given."), citing United States v. Zapata, 180 F.3d 1237, 1242 (11th Cir.

1999).  Lastly, we have already rejected the Defendant's argument, that he was in custody on September 11, 2007, when he gave his consent for the seizure of the marijuana.

In sum, we find nothing in the Record which would support a conclusion that the consent, which was implied by the Defendant's behavior, was coercively gained, or that the Defendant acted in a manner that was involuntary.  Compare, United States v. Fleck, 413 F.3d 883, 892 (8th Cir. 2005)("[The defendant's] production of the bedroom key constituted further indicia of consent to search the bedroom."); United States v. Williams, 346 F.3d 796, 799 (8th Cir. 2003)("Further, consent reasonably implied from behavior suffices to trigger the exception [to the Warrant requirement];" and Court finds that resident holding door to apartment wide open and stepping aside was evidence of consent.); United States v. Mendoza-Cepeda, supra at 627-29 (defendant's gestures in handing bag to officer in response to officer's request to search bag; lifting boots in response to officer's request to search boots; and lifting arms in response to officer's request to search torso; were reflective of voluntary consent); United States v. Jones, supra at 695 (defendant's holding "arms out away from his body about ten to eighteen inches from his midsection, with his palms turned out," found to evidence consent to search torso); United States v. Pollington, 98 F.3d

341, 343 (8th Cir. 1996) ("Of special significance, we note that [the defendant] offered to open the motor home's back door to facilitate [the trooper's] search."); <u>United States v. Gleason</u>, 25 F.3d 605, 607 (8th Cir. 1994), cert. denied, 513 U.S. 911 (1994)("The district court properly inferred [the defendant's] consent from his testimony that facilitated the trooper's search of a cardboard box located in the trunk" and, "[i]n addition to [the defendant's] assistance during the search, the district court noted that [the defendant's] general demeanor suggested consent; he chatted with [the trooper], reminded the trooper of his work as a police officer, and acted friendly, not hostile.").  As a consequence, we recommend that the Defendant's Motion to Suppress Evidence be denied.[9]

NOW, THEREFORE, It is --

---

[9]In the alternative, we concur with the Government's argument that the marijuana would be admissible, pursuant to the inevitable discovery doctrine. Through the testimony of McAuliffe, and Scherf, the Government provided concrete evidence that law enforcement would have sought a Search Warrant for the Defendant's residences, including his grandmother's residence, as an alternative investigatory approach, if the Defendant had refused to identify the location of the marijuana, which would have led to the ultimate discovery of the contested evidence. See, <u>United States v. Warford</u>, 439 F.3d 836, 844 (8th Cir. 2006); <u>United States v. Conner</u>, 127 F.3d 663, 667-68 (8th Cir. 1997).

RECOMMENDED:

1.     That the Defendant's Motion to Suppress Evidence Obtained From Search and Seizure [Docket No. 29] be denied.

2.     That the Defendant's Motion to Suppress Statements, Admissions, and Answers [Docket No. 30] be denied.


Dated: April 25, 2008               _s/Raymond L. Erickson_____
                                   Raymond L. Erickson
                                   CHIEF U.S.  MAGISTRATE JUDGE


## NOTICE

Pursuant to Rule 45(a), Federal Rules of Criminal Procedure, D. Minn. LR1.1(f), and D. Minn. LR72.1(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and by serving upon all parties **by no later than May 9, 2008**, a writing which specifically identifies those portions of the Report to which objections are made and the bases of those objections.  Failure to comply with this procedure shall operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.

If the consideration of the objections requires a review of a transcript of a Hearing, then the party making the objections shall timely order and file a complete transcript of that Hearing **by no later than May 9, 2008**, unless all interested parties stipulate that the District Court is not required by Title 28 U.S.C. §636 to review the transcript in order to resolve all of the objections made.